UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAULA D. LIBERTORE**,                    Case No. 5:11 CV 1245

        Plaintiff,                    Judge Patricia A. Gaughan

    v.                                        REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                    Magistrate Judge James R. Knepp, II

### INTRODUCTION

Claimant Michael Libertore brought this suit appealing the administrative denial of Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under 42 U.S.C. § 1383(c) and 42 U.S.C. § 405(g), respectively. After filing this suit and briefing the merits, Claimant passed away. Following a Motion to Substitute Party (Doc. 20), Paula D. Libertore now appeals the Commissioner's decision on behalf of her deceased husband.

The district court has jurisdiction over this case under 42 U.S.C. §§ 1383(c)(3), 405(g). This case was referred to the undersigned for the filing of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 16, 2011). For the reasons given below, the Court recommends the Commissioner's denial of benefits be affirmed.

### BACKGROUND

Claimant filed applications for SSI and DIB on November 16, 2007, alleging a disability onset date of August 15, 2005. (Tr. 91–97). His applications were denied initially (Tr. 59–62, 63–65) and upon reconsideration (Tr. 70–72, 79– 81). Claimant then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73). Born in 1961, Claimant was 49 years old at the time of

the hearing. (Tr. 91).

<u>Medical History</u>

Claimant had a multitude of medical problems throughout his adult life. In 1989, he had a kidney removed because of a tumor. (Tr. 322). He also suffered strokes in 1987, 1995, and 1996. (Tr. 323). In 1993, he fell from a roof and broke both legs, requiring multiple surgeries and several pins to be placed in his ankles. (Tr. 325). But Claimant's main medical problems giving rise to his applications for benefits stem from a growth on his pancreas in addition to a psychological impairment classified as intermittent explosive disorder. (Tr. 225, 228, 343, 347). Claimant also had diabetes, which was reportedly uncontrolled. (Tr. 361). In SSA forms Claimant filled out, he reported he had recurrent pain that felt like knives were being shoved into his sides and his back was on fire. (Tr. 154, 161). He also indicated he could pay attention "all day", but could not follow written instructions. (Tr. 158). Claimant's counseling records indicated he was in special education classes while in school. (Tr. 238).

Claimant presented to the emergency room at Aultman Hospital in February 2005 with mid-epigastric abdominal pain that reportedly worsened whenever he tried to eat something. (Tr. 220). The attending physician noted Claimant's previous nephrectomy due to an apparently benign tumor. (Tr. 220). Claimant's pain was deemed consistent with a lower esophageal spasm, reflux or stenosis gastritis, or peptic ulcer disease; he was placed on a proton pump inhibitor and instructed to follow-up with a gastroenterologist. (Tr. 220–221).

In September 2005, Claimant returned to the emergency room complaining of lower back pain. (Tr. 219). On examination, some tenderness in Claimant's perilumbar region was noted, but Claimant had good strength and sensation to the arms and legs. (Tr. 219). He was given ibuprofen

for what the attending physician believed was a muscular lumbar strain. (Tr. 219). The following month, Claimant went to the emergency room twice. The first time, Claimant complained of right testicular pain. (Tr. 218). A scrotal ultrasound revealed a right varicocele of uncertain etiology. (Tr. 218). The second time, Claimant complained of a rash. (Tr. 217).

Claimant informed SSA his pain worsened in April 2007. (Tr. 184). He presented to the emergency room two months later with complaints of sharp abdominal pain on his right side. (Tr. 215). A hip x-ray was negative for fractures, dislocations, and significant degenerative changes. (Tr. 216). A CT scan of Claimant's abdomen revealed "some fullness to the mid body of the pancreas", possibly representing pancreatitis or a mass. (Tr. 214). In light of this, the attending physician diagnosed pancreatitis of uncertain etiology, probably idiopathic. (Tr. 215).

Claimant returned to the emergency room in August 2007 with complaints of epigastric and right upper quadrant abdominal pain. (Tr. 210). Claimant also told doctors he had been seeing worms moving around in his bowel movements. (Tr. 212). The attending physician, Karl Wodrich, D.O., noted Claimant's work-up the month before that revealed possible pancreatitis. (Tr. 210). Dr. Wodrich ordered an ultrasound of Claimant's abdomen. (Tr. 210). On the ultrasound, Claimant's pancreas was noted to be "more echoic than usually seen", but no pancreatic ductal dilatation was appreciated. (Tr. 209). Because of a hypoechoic mass-like area at the posterior margin of the pancreas, a pancreatic CT scan was deemed worthwhile. (Tr. 209). The physician interpreting this scan, Syed Zaidi, M.D., reported a 3.0 x 2.2 centimeter "ill-defined hypodense lesion in the body of the pancreas." (Tr. 208). Dr. Zaidi noted pancreatic ductal dilatation distal to the lesion, and indicated the lesion was unchanged since the CT scan taken two months prior. (Tr. 208). He said these findings were "suspicious for neoplasm" but "may also be due to focal pancreatitis." (Tr. 208).

3

In October 2007, Claimant was evaluated and began psychiatric treatment at Trillium Family Solutions. (Tr. 223–226). Counselors there noted Claimant's difficulty controlling anger, but reported he did "not feel depressed." (Tr. 223). Claimant reportedly denied manic symptoms and exhibited no psychotic symptoms. (Tr. 223). Counselors noted his fair judgment but limited insight. (Tr. 225). Personnel at Trillium were mainly concerned with helping Claimant control his anger. (Tr. 230, 232). They noted Claimant had a criminal history stemming from several violent physical confrontations. (Tr. 234–235).

The treatment providers at Trillium diagnosed Claimant with intermittent explosive disorder. (Tr. 225, 228). The symptoms of this disorder Claimant exhibited, as indicated by Trillium records from September 2007, were reportedly anger management deficits, a burning sensation in his body when he became angry, nervousness, shakiness, and aggressive impulses that resulted in assaultive acts. (Tr. 240). At that time, Claimant's therapist at Trillium assigned him a global assessment of functioning (GAF) score of 50. (Tr. 241).

At a November 2007 followup at Trillium, Claimant was found to be coherent and cooperative, with no delusions or hallucinations. (Tr. 305). Also that month, Claimant underwent an upper endoscopy because of abdominal pain and his abnormal pancreatic CT scan. (Tr. 266). The gastroenterologist who performed this procedure, John Vargo, M.D., reported finding esophagitis in the lower third of Claimant's esophagus, gastritis in Claimant's stomach, and diffuse enlargement of Claimant's pancreatic body and tail with associated ductal dilation. (Tr. 266). A fine needle aspiration was done to determine the etiology of Claimant's pancreatic enlargement, and the test was negative for malignant cells. (Tr. 343).

In March 2008, Claimant underwent another CT scan of his pancreas. (Tr. 342–343, 347).

According to the radiologist interpreting the scan, it revealed a pancreatic body mass "likely representing an adenocarcinoma". (Tr. 343, 347).

In October 2008, Claimant underwent an upper endoscopic ultrasound. (Tr. 338). Dr. Vargo once again reported finding esophagitis in the lower third of Claimant's esophagus, as well as a pancreatic mass. (Tr. 338). Dr. Vargo later referred Claimant to surgeon R. Matthew Walsh, M.D., who recorded his impression that Claimant had a pancreatic body neoplasm, and suggested a distal pancreatectomy. (Tr. 327–328). Dr. Walsh noted an endoscopic ultrasound and a fine needle aspiration were each done twice about a year apart, and never revealed any malignancy. (Tr. 328). However, CT scans in December 2008 again showed a large mass in the body of the pancreas. (Tr. 328). The physician interpreting this scan, David Einstein, M.D., noted the mass had apparently grown in size since Claimant's March 2008 CT scan. (Tr. 340). Dr. Einstein wrote that this increase in size plus the appearance of the mass "suggests primary carcinoma". (Tr. 340).

Following his CT scan, Claimant developed left kidney pain he described as a continuous burning sensation, and he returned to the ER the same day. (Tr. 332). Claimant also complained of hand irritation that he believed had spread throughout his body. (Tr. 332). The attending physician, Frederic Hustey, M.D., prescribed mycostatin for Claimant, as Claimant requested, and instructed him to follow up with Dr. Vargo as previously scheduled. (Tr. 334, 337).

Claimant visited multiple emergency rooms in March 2009. First, Claimant complained of a burning sensation in his kidney. (Tr. 412). The attending physician reported Claimant was convinced his symptoms were "because his father had unprotected sex with his mother when he came back from Korea." (Tr. 412). Claimant told hospital personnel he had "had this before and that mycostatin is the only thing that helps". (Tr. 412). Claimant was "almost hostile" and refused any

workup because he only had "one kidney and [did not] want to loose this one". (Tr. 412, 414). Claimant was prescribed mycostatin and discharged home with instructions to follow up with the physician treating him for his pancreatic mass. (Tr. 413–414). "Judging from [Claimant's] behavior", the attending physician wrote, "he obviously has some underlying psychiatric history." (Tr. 414).

Three days later, Claimant presented to a different emergency room complaining of a burning left flank pain that radiated across his abdomen. (Tr. 392). Because Claimant had elevated amylase and lipase levels in conjunction with his pancreatic problems, he was evaluated by Charles Conklin, D.O., at this second ER visit in March 2009. (Tr. 398).

Dr. Conklin's notes explained the condition Claimant was in at the time:

> This is a 48-year-old Caucasian male who presented to the emergency department with the chief complaint of left flank pain. Onset was a few years ago. He has had an intermittent burning sensation that "feels like it is on fire". He does have associated abdominal pain in the epigastric region that feels like a tearing, stabbing pain without radiation. No fevers or chills, no nausea or vomiting. His appetite has been stable without any exacerbation with eating. He has had a 30 lb. weight loss in the last 3–4 months that was unintentional. He denies constipation, melena or hematochezia. He has had some diarrhea, 3[–]4 stools per day for the past week without any steatorrhea. No jaundice, no aggravating or alleviating factors. Pain is a 10 out of 10. The patient has been seen in multiple emergency departments . . . and is convinced that he has [an] infection that he [ac]quired in the 1980s that only "[m]icrostatin" which I believe he is under the impression is nystatin, can cure his problem. The patient has also been evaluated at the Cleveland Clinic by Dr. Walsh for the pancreatic lesion within the last few weeks but he does not have any information on diagnosis unfortunately at this time.

(Tr. 398). Psychologically, Dr. Conklin thought Claimant was "[q]uestionable for schizophrenia." (Tr. 398). Dr. Conklin had contiguous multi-planar unenhanced helical CT scans of Claimant's abdomen conducted, and reported they showed "soft tissue enlargement of the distal half of the pancreas with multiple low attenuating foci distally, high likelihood for malignancy." (Tr. 399, 407).

6

The radiologist interpreting the scan reported multiple distal pancreatic parenchymal low-attenuation masses, with no evidence suggesting an infection, and noted "[m]alignancy is highly considered". (Tr. 407–408). Dr. Conklin diagnosed a "[p]ancreatic mass, questionably a malignancy", and suggested Claimant's weight loss was "likely related" to this diagnosis. (Tr. 399). Claimant was also diagnosed with left renal colic, but was discharged home after pain medicine relieved his flank pain. (Tr. 384, 393–394). He was instructed by Dr. Conklin to follow up at the Cleveland Clinic, where he had already established care for his pancreatic mass. (Tr. 399).

Later that same week, Claimant returned to the emergency room for the third time that month, complaining again of flank pain. (Tr. 383–384). On examination, all systems reviewed were normal. (Tr. 383). Claimant's abdomen was reportedly soft, flat, and non-tender without organomegaly or palpable masses. (Tr. 384). Neurologically, Claimant was reportedly alert and oriented with cranial nerves grossly intact and no motor or sensory deficits. (Tr. 384). The attending physician noted Claimant's history was "positive [for] pancreas growth". (Tr. 383). This time, however, a CT scan of Claimant's abdomen was reportedly normal except for the appearance of a lesion on Claimant's left kidney. (Tr. 384, 387). Remarkably, the radiologist interpreting this CT scan opined that Claimant's pancreas was normal. (Tr. 387).

Claimant went back to the emergency room in June 2009 complaining of being bitten by both a dog and a cat, and fearing he had rabies. (Tr. 381). The attending physician noted Claimant's past medical history was "[s]ignificant for pancreatic cancer". (Tr. 381). On examination, "nothing significant" was found; Claimant reportedly had an unremarkable back and extremities and an excellent range of motion with no neuro deficits noted. (Tr. 381). Claimant was not given any treatment. (Tr. 381).

7

Claimant was hospitalized for five days in September 2009 after behaving bizarrely and displaying homicidal intent. (Tr. 361, 367). Notes from the emergency room physician described the incident that led to this hospitalization:

> This gentleman walked into the county jail lobby earlier today apparently agitated and very illogical, yelling about wanting some medical refills for some of his perceived medical problems. At the time, he appeared to be very threatening to staff and to medical personnel. [Claimant] also allegedly went over to the Rite-Aid Pharmacy where he normally fills his medications, demanding to have "a lifetime refill" of his Mycostatin for some perceived fungal infection of his tongue. When it was apparent that the pharmacy staff was not going to acquiesce to his request, [Claimant] became extremely agitated and threatening, stating clearly that if he had a gun, he w[ould] shoot the doctors, nurses, and other healthcare workers involved in his care. [Claimant] has been extremely irrational and illogical all through the day and very agitated.

(Tr. 367). Claimant was taken to the hospital because the Crisis Center would not accept him with elevated blood sugar. (Tr. 367). While being seen in the emergency room, Claimant also complained of "some vague abdominal pain". (Tr. 361). The attending physician in the emergency room determined Claimant exhibited somatic symptoms. (Tr. 361). However, Claimant reportedly winced "intermittently when different parts of [his] abdomen" were palpated. (Tr. 368). Claimant's toxicology screen was negative for all tested substances. (Tr. 368, 371, 379). An abdominal CT scan did not show any pancreatic abnormalities because the pancreas was "completely obscured by overlying bowel gas". (Tr. 358, 360). Similarly, a CT scan of Claimant's head "showed no acute intracranial findings". (Tr. 369). Before going to the Crisis Center, Claimant was diagnosed with hyperglycemia, hyponatremia, and deep venous thrombosis; the attending physician also made note of Claimant's "history of some chronic pancreatic disorder", and suggested he likely "developed diabetes through his pancreatic disease." (Tr. 369–370).

Psychiatrist Sharad Bhatt, M.D., diagnosed Claimant with adjustment disorder and personality disorder, and referred him to the Crisis Center to follow up after being discharged.

(Tr. 361). Treatment notes indicated Claimant was hostile and "very demanding" to the hospital staff. (Tr. 361). Though he denied homicidal ideation, he "affirmed that if he feels threatened, he would do anything to protect himself, including harming anyone else." (Tr. 368).

Later that month, Claimant returned to the ER complaining of a headache. (Tr. 353). The physician who saw him, Timothy Matlack, Jr., M.D., reported Claimant was vague about his medical history and stated a belief that he needed to be on nystatin to alleviate all of his symptoms. (Tr. 353). Dr. Matlack noted a history that included a psychiatric evaluation for homicidal thoughts, and opined that he came to the ER "more for a psychiatric issue than an actual medical one." (Tr. 353). He suspected adjustment personality disorder. (Tr. 354). Dr. Matlack did not think Claimant's headache merited a CT scan, in light of a prior CT scan that was normal and indicated Claimant was neurologically intact. (Tr. 354).

Claimant began going to the Canton Community Clinic that same month, and continued receiving treatment there until the end of the year. (Tr. 322–325). Treatment notes for each visit during this time reported Claimant had difficulty walking. (Tr. 322, 323, 325). They also discussed Claimant's several other medical issues, including diabetes mellitus, poorly controlled status post fracture of both legs with surgeries, ataxia, and a "questionable pancreatic growth." (Tr. 322). On examination, Claimant exhibited ataxia and a poor gait. (Tr. 322).

Claimant's residual functional capacity (RFC) has been assessed by various consultants since applying for benefits. In July 2007, medical consultant Murrell Henderson, D.O., evaluated Claimant. (Tr. 191–193). Dr. Henderson noted Claimant had begun smoking marijuana to relieve his pain. (Tr. 191–192). On examination, Dr. Henderson reported mostly normal findings. (Tr. 192). He did, however, note a limited range of motion in Claimant's ankles, diminished grip strength in

Claimant's right hand, and difficulty walking. (Tr. 192). In his impression, Dr. Henderson wrote he suspected chemical dependency, degenerative arthritis in the lower extremities, enlarged pancreas, hematuria, blood in the stool, tobaccoism, and status post right nephrectomy for renal cancer. (Tr. 193). As part of the evaluation, Claimant underwent x-rays of his tibia and fibula, which reportedly demonstrated "remote surgical and traumatic pain to the distal tibia and fibula." (Tr. 194). No acute process was confirmed, though. (Tr. 194). Dr. Henderson's conclusion was Claimant's limited range of motion in his lower extremities "likely preclude[s] occupations requiring prolonged standing or walking", but determined sedentary jobs were "probably within his capability." (Tr. 193).        Later in July 2007, medical consultant W. Jerry McCloud, M.D., assessed Claimant's physical RFC. (Tr. 199–206). Dr. McCloud determined Claimant could lift 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for about six hours in an eight-hour workday; and could push or pull without limitation. (Tr. 200). He deemed Claimant partially credible and disagreed with Dr. Henderson's opinion that Claimant could probably only perform sedentary jobs. (Tr. 204, 205).

In February 2008, Claimant's mental RFC was assessed by psychologist Carl Tishler, Ph.D. (Tr. 280–293). Dr. Tishler labeled Claimant's mental impairments as not severe. (Tr. 280). He determined Claimant had only mild restrictions in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 290). His conclusion was that the totality of evidence did "not support the existence of significant functional limitations due to a mental impairment", noting that Claimant complained of more limitation due to his physical pain. (Tr. 292). This assessment by Dr. Tishler was later affirmed by psychologist Karen Stailey-Steiger, Ph.D. (Tr. 303).

Also in February 2008, Claimant's physical RFC was assessed by medical consultant

10

William Bolz, M.D. (Tr. 294–301). Dr. Bolz determined Claimant could lift or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for about six hours in an eight-hour workday; and could push or pull without limitation. (Tr. 295). Dr. Bolz explained Claimant alleged "pancreatic cancer, but medical notes indicate that cystic neoplasm is less likely than acute recurrent pancreatitis." (Tr. 299). Relying on Dr. Henderson's examination and records from the Cleveland Clinic, Dr. Bolz concluded Claimant's "allegations of limitations are not credible." (Tr. 299). This assessment by Dr. Bolz was later "affirmed as written" by medical consultant Eli Perencevich, D.O. (Tr. 304).

<u>Administrative Hearing</u>

Claimant appeared with counsel at a hearing before the ALJ on April 15, 2010. (Tr. 25). Also appearing was Barbara Burk, a vocational expert (VE). (Tr. 25).

When asked about his medical problems, Claimant explained he had a growth in his pancreas that caused "so much pain . . . it's not funny", and two growths on his one and only kidney that caused him to have bloody stool. (Tr. 26–27). He testified he became unable to work because his arms were "only good for an hour" before he became incapacitated by pancreatic pain. (Tr. 26–27). Claimant added he had eleven screws, a pin, and a plate in his right ankle and nine screws, a pin, and a plate in his left ankle. (Tr. 27–28). Upon further questioning, Claimant further added he fell off a roof and crushed his hands, and he had arthritis in his legs that resulted in a limited range of motion. (Tr. 40).

The ALJ inquired about Claimant's medical treatment, and Claimant responded with a diatribe about his arguments with welfare personnel and his inability to collect enough aluminum cans to afford transportation to a doctor. (Tr. 31–32). Claimant testified he was supposed to be on

11

numerous prescriptions but simply could not afford any of them. (Tr. 33).

The ALJ asked Claimant about the drug allergies he told a consultant physician he had. Specifically, the ALJ asked, "[H]eroin. How in the devil would you know whether you're allergic to heroin or not?" (Tr. 34). Claimant replied that his doctors ran a test to confirm this because they were considering using heroin instead of morphine during Claimant's kidney removal, given that Claimant was also allergic to morphine. (Tr. 34–35).

The ALJ asked Claimant about his threats at the Rite Aid in 2009. (Tr. 35–36). Claimant explained that when he was on mycostatin, it completely freed him of pain, but his doctors would not give it to him. (Tr. 36). When the ALJ remarked that mycostatin is for rashes, Claimant said,

> I don't know what it does or why it does it, but it work[s]. The pain is gone. I can dead lift 350 pounds. I can do 75-pound – I can pick up 75-pound pellets, steel pellets, 14 – or, 12 hours a day, without any pain. No pain, no problem, nothing. It stops everything, everything but the legs. . . . I've been going from doctor, to doctor, to doctor, to doctor, getting mycostatin.

(Tr. 36).

When first asked by counsel about his psychological problems, Claimant acknowledged he received help at Trillium and said he wanted to continue going there, but otherwise delivered an incoherent and unresponsive answer. (Tr. 38–39). Later on, Claimant discussed his difficulties interacting with co-workers. He said if it were legal, he would "just put a bullet in them" so he could do his job without a problem. (Tr. 44). He testified that any job he worked needed to be where he was "totally alone" so that co-workers and supervisors could not bother him. (Tr. 44).

Claimant testified about his RFC. He said he could be on his feet for four hours if standing in grass or dirt, but could only stand for 20–40 minutes if on concrete, and added it further depended on whether he was standing on cardboard stacked on top of the concrete. (Tr. 40). He said the most

12

he could walk is a mile, but then he would have to crawl. (Tr. 41). After an hour of use, Claimant testified his wrist start snapping, and that causes him to get angry. (Tr. 41–42). Claimant testified he could no longer have sex or ride in a car because any sort of jarring motion caused him pancreatic pain. (Tr. 42–43). He could, however, sit without pain as long as he leaned forward. (Tr. 43). Since 2005, Claimant testified the heaviest weight he had lifted was 35 pounds, but if he had to do that more than once it would cause pain. (Tr. 43). When asked what he could lift repetitively, Claimant's response was no more than ten to fifteen pounds. (Tr. 44).

Claimant testified about his vocational history. He said he had done prior work cutting rags at Goodwill (Tr. 26–27), working on an assembly line for plastic sippy cups (Tr. 28), doing maintenance at McDonalds (Tr. 30), and working for a temp agency (Tr. 30). Claimant said he quit his most recent jobs at McDonalds and Goodwill because his pain was too bad. (Tr. 30–31).

The VE testified and classified Claimant's prior production assembler and labeler work as light and unskilled. (Tr. 46). She classified Claimant's commercial cleaner job as very heavy and unskilled. (Tr. 46). The ALJ then posed a hypothetical to the VE, asking her to assume a hypothetical individual who can lift or carry 50 pounds occasionally, 25 pounds frequently; can stand, walk, or sit six hours out of an eight-hour workday; can push or pull without limitation; can frequently use a ramp or stairs, but never use a ladder, rope, or scaffold; can frequently balance, stoop, or kneel, but only occasionally crouch or crawl; is limited to low-stress work with no high-production quotas or piece rate work; cannot perform work involving arbitration, confrontation, or negotiation; and can only have superficial interpersonal interactions with the public and coworkers. (Tr. 47). Such a hypothetical individual, the VE testified, could not perform Claimant's prior relevant work. (Tr. 49). She said he could, however, perform the jobs of cook helper, dining room

13

attendant, or dishwasher, each of which accounts for more than a thousand positions in the regional economy. (Tr. 49–50).        The ALJ then altered his hypothetical such that the person could lift only 20 pounds occasionally and ten pounds frequently. (Tr. 50). Such a person, the VE testified, could perform the jobs of a light level commercial cleaner, housekeeping cleaner, or parking garage cashier, each of which accounts for thousands of positions in the regional economy. (Tr. 51–52). When the additional restriction of no contact with the public was added, the VE eliminated the cashier job but maintained such a person could still be a commercial cleaner. (Tr. 52).

Claimant's counsel asked the VE if a person who is off-task 20% of the time because of racing thoughts, inability to interact, and "things of that nature", could still perform jobs in the economy. (Tr. 53). The VE answered such a person could not do any of the previously mentioned jobs "or any other jobs." (Tr. 53).

The Commissioner's Decision

The ALJ issued an unfavorable decision on May 13, 2010. (Tr. 6–18). He found Claimant satisfied the insurance requirements for DIB until March 31, 2008. (Tr. 11). He concluded Claimant had the severe impairments of personality disorder and osteoarthrosis, but his impairments did not meet or equal a listing. (Tr. 11–12). Considering Claimant's RFC and adopting VE testimony, the ALJ determined there were ample jobs in the economy Claimant could still have performed. (Tr. 12–18). Therefore, the ALJ made a finding of not disabled.

Claimant requested review of the ALJ's decision. (Tr. 189–190). The Appeals Council subsequently denied review on May 3, 2011 (Tr. 1–3), making the ALJ's denial the final decision of the Commissioner. Claimant filed suit appealing this decision in June 2011, and died about six months later with the official cause of death listed as "pancreatic adenocarcinoma". (Doc. 19-1, at

14

1–2).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 1382(a)(1), 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination
      of impairments, that is "severe," which is defined as one which substantially
      limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform
      past relevant work?

5.    Can claimant do any other work considering his residual functional capacity,
      age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the

national economy. *Id.* The Court considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only

if a claimant satisfies each element of the analysis, including inability to do other work, and meets

the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f),

416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

As an initial matter, the Court is aware of Claimant's official cause of death and cognizant

of the fact the ALJ essentially determined Claimant did not have the very impairment – pancreatic

cancer – that ultimately killed him. However, not only is this information completely irrelevant

under this Court's review of the Commissioner's decision on the record he had before him, but also,

in fairness to the Commissioner, Claimant's death certificate states he only had this impairment for

three months before he died in January 2012. (Doc. 19-1, at 1–2). In other words, even if Claimant's

16

death certificate were in the record to be considered on appeal to this Court, it would actually be evidence supporting the conclusion that Claimant did *not* have pancreatic cancer until roughly October 2011 – about a year and a half after the ALJ's decision.

Also, the Court is not convinced the law allows a claimant's survivors to receive SSI benefits when the claimant did not survive until a determination of disabled was made. *See Pollard v. Sullivan*, 824 F. Supp. 129, 130–131 (N.D. Ill. 1992) ("Plaintiff's decedent was not entitled to benefits unless she survived through the time when the benefit determination was concluded."). Nonetheless, unlike SSI, DIB is not a need-based entitlement paid from the general revenues, and Claimant filed an application for DIB in addition to his application for SSI, so the uncertainty regarding SSI benefits in this case does not moot the need for the Court to review the Commissioner's determination of not disabled.

Plaintiff now challenges the ALJ's decision on two grounds, arguing that the ALJ erred by not finding Claimant's pancreatic mass to be a severe impairment, and that the ALJ erred by not fully and fairly evaluating the limitations resulting from Claimant's severe impairments. These arguments are addressed in turn.

Severe Impairments at Step Two

Plaintiff argues the ALJ should have considered Claimant's pancreatic mass to be a severe impairment. This argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers from a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576–577 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step

17

two is merely a threshold inquiry. 20 C.F.R. §§ 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 SSR LEXIS 5 at, *14). In other words, if a claimant has at least one severe impairment found at step two, the ALJ must continue on with the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not.

Here, the ALJ found Claimant had the severe impairments of personality disorder and osteoarthrosis. (Tr. 11). But because the ALJ continued on with the disability analysis, his failure to cite Claimant's pancreatic mass as a severe impairment is harmless so long as the ALJ properly evaluated all limitations established in the record, whether from impairments deemed severe or not.

Full and Fair Evaluation of Claimant's Impairments

Plaintiff disputes the notion that the ALJ fully evaluated the limitations imposed by all of Claimant's impairments, and therefore found an RFC unsupported by substantial evidence. The ALJ made the following finding with respect to Claimant's RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c). Specifically, he can lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk six hours in an eight hour workday; sit six hours in an eight hour workday; no limit on push/pull. Except he can frequently use ramps or stairs, but never ladders, ropes or scaffolds; can frequently balance, stoop, kneel, and occasionally crouch and crawl; he must avoid unprotected heights. He should perform low stress work, no high production or piece rate work; no work involving arbitration, confrontation or negotiation; and he should have only superficial interpersonal interaction with the public and coworkers.

(Tr. 12–13).

First, Plaintiff argues this RFC failed to adequately address Claimant's mental limitations. Specifically, Plaintiff argues the restriction to low-stress work involving no arbitration,

18

confrontation, or negotiation did not adequately account for Claimant's marked limitation in maintaining social functioning. Plaintiff also argues the ALJ's finding that Claimant was capable of superficial interpersonal interaction with the public and co-workers is unsupported by substantial evidence.

The ALJ found Claimant had a marked limitation in maintaining social functioning. (Tr. 12). The regulations explain the concept of social functioning in great detail:

> Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile[,] but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts. . . .
>
> Social functioning includes the capacity to interact independently, appropriately, effectively, and on a sustained basis with others. It includes the ability to communicate effectively with others. We will find that you have a "marked" limitation in maintaining social functioning if you have a serious limitation in social interaction on a sustained basis because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, or a pattern of exacerbation and remission, caused by your [impairment] or its treatment, even if you are able to communicate with close friends or relatives.

20 C.F.R. Pt. 404, App'x 1, § 12.00, C.2; § 14.00, I.7.

By definition, a finding of marked difficulties in social functioning implies a serious

19

limitation in a claimant's ability to get along with others on a sustained basis. So when the ALJ determined Claimant had marked difficulties in this area, he found a serious limitation that needed to be accommodated in Claimant's RFC. Plaintiff, without citation to any case, says a marked limitation in maintaining social functioning requires more than a restriction to low-stress work involving no arbitration, confrontation, or negotiation. However, the Court finds no precedent for saying the two are incompatible. To the contrary, a restriction to jobs without arbitration, confrontation, or negotiation, and further involving only superficial interpersonal interaction with the public or co-workers, is a significant enough limitation to sufficiently accommodate for Claimant's marked social functioning difficulties. Of course, this relies on Claimant's ability to maintain such superficial interpersonal interactions, which Plaintiff also disputes.

Plaintiff argues the record lacks substantial evidence showing Claimant was capable of having superficial interpersonal interactions with the public and co-workers, and given the amount of evidence in the transcript displaying Claimant's inability to behave in a socially appropriate manner, this argument is compelling at first. There is more than substantial evidence in the transcript supporting a conclusion that Claimant was not capable of maintaining superficial interpersonal interactions with the public and co-workers. For example, Claimant was reportedly "very demanding" and hostile to staff at multiple hospitals. (Tr. 361, 414). Personnel at Trillium were concerned about Claimant's ability to control his anger (Tr. 230, 232), while a psychiatrist diagnosed him with personality disorder (Tr. 361), and Dr. Conklin thought he was "questionable for schizophrenia" (Tr. 398). Claimant had a criminal history stemming from several violent physical confrontations. (Tr. 234–235). Claimant testified he would "just put a bullet in" people if he were legally allowed to (Tr. 44), and had previously said similar things to Dr. Bhatt and

20

counselors at Trillium (Tr. 238, 368). Claimant had displayed homicidal intent toward others, once being hospitalized for five days after putting on a bizarre and "very threatening" tirade at the county jail and a Rite-Aid. (Tr. 361, 367). However, even in the face of this evidence to the contrary, the Court must still affirm if substantial evidence also supports the ALJ's position. *See Jones*, 336 F.3d at 477.

Defendant relies on several facts for substantial support of this determination by the ALJ: Claimant admitted he was close to his father and daughter (Tr. 233); Claimant socialized with friends, went to church, and volunteered (Tr. 238); Claimant listed his ability to get along with people and help people as an area of strength (Tr. 238); and Plaintiff reported he got along with authority figures as long as they did not talk to him (Tr. 158). As explained below, the Court finds most of these facts unpersuasive as evidence supporting the ALJ's contention, but other evidence in the transcript in combination with some of these facts amounts to substantial evidence supporting the superficial interactions ability in the RFC.

The facts Claimant socialized with friends (Tr. 238) and was close to his father and daughter (Tr. 233) do not help support the ALJ's conclusion Claimant was able to maintain superficial interpersonal interactions with the public and co-workers. This is mainly because a claimant's father and daughter are neither the public nor co-workers, but also because the regulations understandably recognize that a claimant can have marked difficulties in social functioning even if he is able to communicate with close friends and family. 20 C.F.R. Pt. 404, App'x 1, § 12.00, C.2; § 14.00, I.2.

Claimant never listed his ability to get along with, and help, people as an area of strength. That information was contained in a note made by Claimant's counselors at Trillium. (Tr. 238). It is ambiguous from the record whether this was something Claimant actually said or merely an

impression gleaned by one of Claimant's counselors from something in Claimant's history. The same is true for Claimant going to church and volunteering. (Tr. 238). But notably, the same list of "[a]reas of strength" that included helping people also included the entry "can take advantage of people". (Tr. 238). So if Claimant thought his ability to help people was an area of strength, he also thought his ability to take advantage of people was an area of strength. At the very least, this reinforces the ALJ's finding of marked difficulties with social functioning; it does not, however, support the ALJ's conclusion that Claimant was capable of superficial interpersonal interactions with the public and co-workers.

The fact Claimant went to church and volunteered also falls short of showing he was capable of superficial interactions with the public and co-workers when those bits of information are read in light of the rest of the Trillium records. Trillium's reports from the same time indicate Claimant had "gone through over 100 jobs!" because he "can't hang onto them" (Tr. 234), had an extensive criminal record that included violence (Tr. 234), had rage and homicidal thoughts toward specific people (Tr. 232), had relationship problems (Tr. 232), had perpetrated emotional abuse (Tr. 237), and "wanted to be a 'loner'" (Tr. 238).

When asked on an SSA form how well he gets along with authority figures, Claimant wrote, "[a]s long as they don't talk to me we get along." (Tr. 158). Defendant cites this in support of the ALJ's contention that Claimant was capable of maintaining superficial interpersonal interactions with the public and co-workers, but it is inapplicable on its face. The limitation of "[a]s long as they don't talk to me" prohibits this comment from supporting the ALJ's determination about interacting with supervisors. What Claimant actually said was he could get along with supervisors so long as there was *no* interaction – a more restrictive proposition than merely superficial interaction, which

surely involves some, albeit limited, communication. This fact cannot be used as substantial support in the record for Claimant's ability to maintain superficial interactions with people.

The Court is nevertheless able to find substantial support in the record for Claimant's ability to maintain superficial interactions with the public and co-workers. At a November 2007 face-to-face interview conducted by an SSA employee, Claimant reportedly showed "[n]o obvious impairments. He was alert and cooperative." (Tr. 129). A second face-to-face interviewer noticed "nothing unusual" about Claimant in April 2008. (Tr. 167). Both of these interviewers reported Claimant had no difficulty talking, answering, sitting, standing, hearing, or concentrating. (Tr. 129, 167). These SSA employees were certainly members of the public from Claimant's perspective, and they apparently interacted with Claimant on a more-than-superficial basis without difficulty.

Claimant also interacted with other strangers in the transcript without difficulty. For instance, consultant Dr. Henderson examined Claimant and made no mention of any difficulty interacting with him. (Tr. 192). At one of Claimant's several ER trips, the attending physician reported his "behavior was completely normal." (Tr. 355). At another ER trip, Claimant was "[a]nswering questions appropriately." (Tr. 212). Similarly, at the ALJ's hearing, Claimant displayed no inability to interact with the public on a superficial basis; rather, Claimant could not say enough to the ALJ. Frankly, Claimant exhibited racing thoughts and an inclination to talk as much as possible throughout his hearing testimony. His testimony involved several tangential harangues, but he interacted with the ALJ well enough to support a finding he could interact with the public at least superficially. Claimant answered almost all of the ALJ's questions in great detail, and even exhibited socially acceptable courtesy at the hearing by apologizing to the ALJ for showing up late. (Tr. 26).

Furthermore, both consultants who undertook mental RFC assessments of Claimant

23

concluded he did not have any significant limitations caused by a mental impairment. (Tr. 292, 303). Dr. Tishler determined Claimant had only mild restrictions in maintaining social functioning – a determination later affirmed by Dr. Stailey-Steiger. (Tr. 290, 303). All of this amounts to substantial evidence supporting the ALJ's conclusion Claimant was capable of superficial interpersonal interaction with the public and co-workers.

Second, Plaintiff argues the ALJ's RFC failed to adequately address Claimant's physical limitations. That is, Plaintiff argues the finding Claimant could perform medium work is unsupported by substantial evidence. Medium exertional work is defined by the regulations: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c). By express incorporation, the ability to perform medium work includes the ability to perform lower exertional activities, such as "a good deal of walking or standing", or "sitting most of the time with some pushing and pulling of arm or leg controls". 20 C.F.R. §§ 404.1567(b), 416.967(b).

Here, there is substantial evidence supporting the conclusion Claimant was capable of performing medium exertional work. Plenty of examination and treatment notes in the record indicate as much. For example, in February 2005, Claimant reportedly had "[n]o extremity symptoms". (Tr. 220). An extremity examination showed "no calf asymmetry, tenderness, or swelling", with normal turgor and texture. (Tr. 220). In September 2005, Claimant showed good strength and sensation to the arms and legs. (Tr. 219). At that time, Claimant had "[n]o extremity complaints." (Tr. 219). An October 2008 examination showed Claimant had normal extremities with no edema and a good range of motion in Claimant's joints. (Tr. 344). Examination notes from

24

December 2008 reported Claimant had erect posture with a straight spine, no deformities, no spinal tenderness, symmetrical muscles and extremities, full range of motion, and full extremity strength. (Tr. 333). During one of Claimant's March 2009 trips to the ER, he was reportedly "able to ambulate independently" and "perform all activities of daily living without assistance." (Tr. 392). A June 2009 examination showed "excellent range of motion", unremarkable back and extremities, and no swelling. (Tr. 381).

Consultants Dr. Bolz and Dr. McCloud both determined Claimant could lift or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for about six hours in an eight-hour workday; and could push or pull without limitation. (Tr. 200, 295). Dr. Bolz further said Claimant's allegations of limitation were not credible (Tr. 299), while Dr. McCloud deemed Claimant only partially credible (Tr. 204). Even consultant Dr. Henderson, who thought Claimant was limited to sedentary work because of arthritis in his extremities, noted "essentially normal" range of motion in Claimant's extremities, good flexion, and no sign of muscle atrophy upon examination. (Tr. 192). Dr. Henderson also reported Claimant "was able to walk on his heels." (Tr. 192). All of this evidence supports the ALJ's determination that Claimant was capable of performing medium exertional work.

Plaintiff also argues the ALJ's RFC finding failed to accommodate for the effects of Claimant's abdominal pain. With respect to this issue, the ALJ found, "[i]n terms of the claimant's alleged abdominal pain, the evidence shows that he has a growth on his pancreas; however, the degree of symptoms alleged by the claimant exceeds the evidence of record." (Tr. 14). On review, this finding is supported by substantial record evidence.

There is overwhelming medical evidence in the transcript establishing that Claimant had a

25

pancreatic mass. The record contains five CT scans (Tr. 208, 214, 328, 340, 347, 399, 407), an upper endoscopy (Tr. 266), and an abdominal ultrasound (Tr. 338) that all revealed a mass of unknown etiology on Claimant's pancreas. There was even some evidence suggesting the mass was actively growing in size. (Tr. 340). With the benefit of hindsight, it is now an accepted medical fact Claimant ultimately died from a pancreatic adenocarcinoma. (Doc. 19-1, at 1–2). Several physicians who treated him predicted that his pancreatic mass was indeed an adenocarcinoma (Tr.340, 343, 347, 399, 407), yet two endoscopic ultrasounds and two fine needle aspiration biopsies performed on the mass were all negative for malignancy (Tr. 328, 343). Every doctor who saw images of the mass opined that it looked like cancer, but no doctor who conducted further tests on it could find any etiological proof it was cancerous. The ALJ correctly noted this in his explanation. (Tr. 14).

Substantial evidence in the record suggests the abdominal pain Claimant often sought treatment for was not of disabling severity. An assortment of treatment records indicate Claimant's pain was inconsistent, treatable, and possibly somatic. For instance, in March 2008, Dr. Vargo's nurse described Claimant's functional status as including "heavy work around the house, such as scrubbing floors, lifting or moving heavy furniture". (Tr. 328). She also reported Claimant's pain was alleviated by the pain medication he was on at the time. (Tr. 328). In September 2009, Claimant was seen by an ER physician who, after making unremarkable findings on examination, concluded Claimant's complaints of symptoms while not taking nystatin (also known to Claimant as mycostatin) were "more f[rom] a psychiatric issue than an actual medical one". (Tr. 353). Similarly, Latha Jayaraman, M.D., who treated Claimant after his bizarre episode at the Rite-Aid, noted Claimant's complaints of "vague abdominal pain", but determined Claimant exhibited "multiple somatic symptoms" and referred him to a psychiatrist. (Tr. 361–362). All of this is inconsistent with

Claimant having disabling abdominal pain. In fact, the idea that his abdominal pain was somatic or actually psychological is further supported by Claimant's obsession with, and reported successful pain alleviation from, mycostatin/nystatin (Tr. 36, 332–334, 353, 367, 398, 412) – an anti-fungal medication that at least one physician refused to prescribe him for his abdominal pain because it was not clinically indicated (Tr. 351).

The forms Claimant filled out for SSA also suggest his pain was less than disabling. Though Claimant testified any kind of jarring motion caused pain (Tr. 42) and it felt like knives were being shoved into his ribs (Tr. 155), he indicated on SSA forms that he could do his own laundry, walk, ride in a car, and use public transportation (Tr. 155–156).

Given the statutory standard of review, the Court cannot fault the ALJ for relying in part on medically acceptable tests showing no malignancy for determining Claimant's pancreatic mass did not cause disabling pain. Plaintiff argues the mass was not fully worked-up at the time of the ALJ's hearing, but it is a claimant's burden to establish medical evidence of an impairment, *see Jones*, 336 F.3d at 474, and Plaintiff has not requested a sentence six remand to consider new evidence of further tests on Claimant's pancreatic mass. Because every pathological test found no malignancy, and substantial evidence suggests Claimant's abdominal pain was not of disabling severity, the ALJ's physical RFC determination has the support of substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Commissioner's decision denying benefits is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                                        ___s/James R. Knepp, II___
                                               United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).